EDWIN L. STOHLMAN, III, ET AL.

V.

S&B LIMITED PARTNERSHIP, ET AL.

Record No. 940851

March 3, 1995

Present: All the Justices

*Dale A. Cooter (Donna S. Mangold; Cooter, Mangold, Tompert, Chapman & Cooter*, on briefs), for appellants.

*R. Terrence Ney (John S. Stump; M. Melissa Glassman; Joseph W. Wright, III; Peter J. Willsey; McGuire, Woods, Battle & Boothe*, on brief), for appellee American Security Bank, N.A.

No brief or argument on behalf of S&B Limited Partnership and Benjamin B. Bell, Jr.

JUSTICE WHITING delivered the opinion of the Court.

In this appeal, we decide whether the evidence is sufficient to support an award of damages for breach of contract.

In 1986, Stohlman Automotive Group, Inc. (SAG) was interested in establishing an automobile dealership and corporate headquarters on U.S. Route 1, south of Alexandria. SAG, however, wanted someone else to acquire and develop the property, and Benjamin B. Bell, Jr., agreed to do so.

In September 1986, SAG signed a 10-year lease for over 60% of the 88,000 square feet of rentable space in a multi-story building that Bell planned to erect on the property. Edwin L. Stohlman, III, personally guaranteed the tenant's obligations under the lease.

Later, the lease contract was amended, substituting S&B Limited Partnership (S&B) for Bell as the lessor, and adding Edwin

Stohlman, Inc., T/A Stohlman Nissan/Saab, as a tenant.[1] Since the two Stohlman corporations and Edwin L. Stohlman, III, do not distinguish between their respective rights and liabilities in this case, we will refer to them individually and collectively as Stohlman.

S&B, with Stohlman's participation, designed the ground floor and basement of the building for one of SAG's automobile dealerships and the top two floors for SAG's executive offices. SAG's lease was to begin upon Bell's substantial completion of the building.

In April 1989, S&B executed a deed of trust upon the property and assigned the Stohlman lease to American Security Bank (ASB) to secure the payment of ASB's $11 million acquisition and construction loan upon the property. Stohlman subordinated its lease to the deed of trust. Stohlman also agreed that if the property was sold under the deed of trust, Stohlman would be "directly bound" to any purchaser of the property.

Thereafter, ASB made periodic advances to S&B for acquisition of the land and construction of the building. During the course of construction, Stohlman advised S&B that "it no longer [had] any interest" in leasing space in the building. However, S&B contended that Stohlman was still bound on the lease and continued construction.

In the latter part of 1990, the Northern Virginia market for the rental and sale of this type of property declined. And beginning in 1991, there was a severe recession in that market. On October 25, 1990, when the building was 85% complete, Stohlman gave written notice to ASB that Stohlman would not lease space in the building.

On November 5, 1990, Stohlman filed a bill in equity against S&B and Bell seeking, among other things, a declaration that the lease was void and unenforceable. S&B and Bell responded by asking the court to declare the lease valid and binding. ASB intervened and filed an answer and cross-bill.

ASB deemed the "prospect of protracted and expensive litigation regarding the lease" and the diminution of the value of its security by the possible loss of Stohlman's lease as material

---

[1] S&B was originally comprised of Bell and Edwin L. Stohlman, III, as limited partners and Bell as the general partner. Later, when Edwin L. Stohlman discovered that he would have to personally guarantee payment of any construction financing, he assigned his interest in the partnership to Bell and Bonnie L. Bell, Bell's wife.

changes in S&B's financial condition. Accordingly, ASB exercised a contractual right not to make further advances unless S&B deposited $387,217 with ASB to cover the expected "shortfall" of funds to complete and finance the project.

Since S&B was unable to make the deposit, ASB advanced no further funds and construction stopped. And S&B could not comply with ASB's later demand under their contract that S&B pay the $8,229,768.49 principal balance of the loan, plus interest and other charges. Hence, ASB directed the trustee to sell the property under the deed of trust.

ASB, the only bidder at the trustee's sale on October 23, 1991, bought the property for $1,150,000, and assigned its rights to SOB-A Corporation (SOB-A), which was organized by ASB. Upon acquisition of title from the trustee on November 6, 1991, SOB-A found that it would cost from $750,000 to $950,000 to complete construction of the building. Accordingly, SOB-A decided to sell the property without completing it.

SOB-A planned to dispose of the property, either by leasing it to a credit-worthy tenant and selling "the value of that lease to an investor," or by selling the property directly to a user or investor. SOB-A mailed information about the property to 31 possible tenants and real estate brokerage companies, and directly contacted 13 of those parties, as well as a number of other possible users. However, SOB-A received only four offers to purchase the property and no offers to lease the property at any price. On October 28, 1992, SOB-A contracted to sell the property to Jemal Alexandria, Inc., for $1,950,000 and closed on that contract in September 1993.

The case was tried before the court in January 1994. By agreement of the parties, ASB's claim against Stohlman seeking damages for breach of the lease was heard first. At the conclusion of ASB's case, Stohlman rested its case without presenting evidence.[2] Conceding that it had breached the lease between October 19 and 25, 1990, Stohlman nevertheless moved for judgment in its favor upon the ground that ASB had failed to prove its damages. Stohlman contended that ASB had not introduced evidence of the fair market rental value of the leased premises, "ready to go, [and] functional," on the date of the breach.

---

[2] S&B and Bell took no part in the trial.

Concluding the evidence showed that at the time of Stohlman's breach and afterward the premises had no apparent rental value, the court denied Stohlman's motion. Hence, the court entered judgment against Stohlman for $4,579,093, the discounted present value of the lease as of the date of the breach, less the sale price of the property to Jemal, since ASB was willing to give Stohlman this credit. Stohlman appeals.

■ Because Stohlman breached the provisions of its lease prior to taking possession of the premises, its liability for that default arises from breach of contract. *James v. Kibler*, 94 Va. 165, 172, 26 S.E. 417, 418 (1896); *see Branning Mfg. Co. v. Norfolk-Southern R.R.*, 138 Va. 43, 60, 121 S.E. 74, 79-80 (1924). And, ASB had the burden of showing "that the rental value of the [Stohlman lease] was less than the contract rental." *Id.* at 61, 121 S.E. at 80.

Stohlman argues that the judgment should be reversed because "ASB failed to offer *any* evidence as to the fair market rental value of the lease premises in question in violation of this court's ruling in *Branning*." We disagree.

■ Stohlman's reliance upon *Branning* is misplaced. In *Branning*, the evidence showed that the completed buildings had rental value; indeed, some of these buildings continued to be rented to prior tenants after the defendant's breach. In contrast, Bell testified that not long before Stohlman's breach, when Stohlman told him it was no longer interested in the space, he and Stohlman attempted unsuccessfully to interest a number of other automobile dealers in leasing the Stohlman space. In addition, ASB's evidence showed that it was likewise unsuccessful in its attempt to lease the entire building after Stohlman's breach. In our opinion, this evidence and the evidence of the market decline provide *prima facie* evidence that Stohlman's lease in the uncompleted building had no apparent market value on the date of Stohlman's breach.

However, Stohlman contends that ASB had the additional burden of showing the "hypothetical" market rental value of Stohlman's portion of the building had ASB completed construction. ASB denies that it had this additional burden under the facts in this case.

Stohlman's contention ignores the reality of the situation shown in this record. ASB's uncontradicted evidence discloses that it

would have cost up to $950,000 to complete the building in a severely depressed real estate rental and sale market.

■ Thus, the evidence permits an inference that it would have been unreasonable to spend those additional funds. Therefore, ASB had no obligation to do so. As noted by one authority on damages:

> If the effort, risk, sacrifice or expense which the person wronged must incur in order to avoid or minimize a loss or injury is such that under all the circumstances a reasonable man might well decline to incur it, a failure to do so imposes no disability against recovering full damages.

*Charles T. McCormick, Handbook on the Law of Damages* § 35 (1935); *accord CSX Transp., Inc. v. Casale*, 247 Va. 180, 185-86, 441 S.E.2d 212, 216 (1994) (plaintiff must do what reasonable man would have done to limit damages); *Foreman v. Caligari, Inc.*, 204 Va. 284, 289-90, 130 S.E.2d 447, 451 (1963) (contract breacher's mitigation instruction speculative and improper where "most probable" suggested mitigation would have increased damages); *Hannan v. Dusch*, 154 Va. 356, 378, 153 S.E. 824, 831 (1930) (plaintiff must exercise "reasonable exertions or care" to prevent damages). Accordingly, we conclude that ASB established a *prima facie* case of damages.

■ And, where a plaintiff makes a *prima facie* case of damages, we impose the burden upon the defendant of going forward with evidence to reduce those damages. *Casale*, 247 Va. at 185-86, 441 S.E.2d at 215-16 (reduction of injured Federal Employers' Liability Act plaintiff's projected loss-of-wage claim to present market value); *Lee v. Bell*, 237 Va. 626, 630-31, 379 S.E.2d 464, 467 (1989) (evidence of landlord's betterment in replacing personal property wrongfully removed by tenant); *see Paddock v. Mason*, 187 Va. 809, 818-19, 48 S.E.2d 199, 203-204 (1948) (opportunity for "other employment of an approximately similar kind reasonably adapted to his abilities" by wrongfully discharged employee).

■ Since ASB had established a *prima facie* case of damages, we think that Stohlman had the burden of going forward with evidence to show the advisability of completing the building in order to shift the burden to ASB to prove the "hypothetical" rent. There being no such evidence, we conclude that the evidence sup-

ports the trial court's finding that the premises had no apparent rental value on the date of Stohlman's breach.[3]

Accordingly, the judgment will be

*Affirmed.*

---

[3] We do not consider Stohlman's contention that any recovery should be reduced by the costs of completing, maintaining, and operating the building during the term of the lease. That contention is not within the scope of the assignments of error; they are confined to alleged failures in the proof of damages. Rule 5:17(c).